UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAVAGO AMERICAS LLC,

     Plaintiff,

                                CASE NO. _____

v.

KIRT DMYTRUK,

     Defendant.                       DECEMBER 13, 2018

_____

## <u>COMPLAINT</u>

Plaintiff Ravago Americas LLC ("Ravago") brings this action against Defendant Kirt Dmytruk ("Dmytruk") under Connecticut law, the Defend Trade Secrets Act, and Florida law. Dmytruk is a former Ravago employee who recently left Ravago to launch a start-up division of a direct competitor; that start-up division now competes directly with Ravago's resale business. Before leaving Ravago, Dmytruk violated his duties to Ravago by providing confidential information and trade secret information to his new employer. Dmytruk also lied to Ravago about his computer files and information, deleting over five years of Ravago information from his then Ravago computer. Now, with his new employer, Dmytruk is continuing to misappropriate Ravago's confidential information and trade secrets, and is violating his contractual obligations to Ravago, which are governed under Connecticut law. Thus, Ravago seeks injunctive relief precluding Dmytruk from using the confidential and trade secret information he misappropriated, and compensatory, exemplary and punitive damages as may be allowed by law.

# PARTIES

**Plaintiff Ravago**

1.     Ravago is a Delaware limited liability company with its headquarters at 1900 Summit Tower Boulevard, Suite 900, Orlando, Florida 32810.

2.     Ravago distributes, resells, and compounds a wide range of plastic and rubber materials purchased from its suppliers, ranging from high performance, engineered resins to recycled, post-consumer materials.

3.     Ravago operates resale, distribution, manufacturing, and logistics businesses through various divisions.

4.     One of those divisions is Muehlstein, which is a reseller and distributor of resin products. Muehlstein became a division of Ravago when Ravago acquired Muehlstein in 2006.

5.     Ravago's business, particularly its Muehlstein business, involves high volumes and narrow profit margins, and product availability, pricing and personal relationships are very important to its overall success.

6.     Ravago is a privately held company. Ravago does not share its financial information and other business information with the public.

7.     Ravago has offices in Connecticut.

**Defendant Dmytruk**

8.     Dmytruk joined Muehlstein in 2003 as a member of its sales team. Dymtruk became employed by Ravago upon its acquisition of Muehlstein. Prior to joining Muehlstein, Dmytruk worked in a non-commercial role as a Co-op Process Chemical Engineer.

9.     On May 15, 2006, Dmytruk executed a Non-Solicitation and Confidentiality Agreement ("Agreement") for Muehlstein. The Agreement is governed by

Connecticut law. The Agreement contains an exclusive forum selection clause placing jurisdiction in the state or federal courts of Connecticut.

10. A true and correct copy of Dmytruk's Agreement is attached hereto and incorporated herein as Exhibit A.

11. In 2013, Dmytruk became the Business Manager of a Ravago distribution division.

12. As Business Manager of the distribution division, Dmytruk was responsible for maintaining and developing relationships with the division's polypropylene supply partners, and overall commercial management of the polypropylene business, including product strategy, pricing, inventory management, and sales to customers.

13. On March 28, 2018, Dmytruk was promoted to become an officer of Ravago, specifically Vice President of Ravago Manufactured Products. As the Vice President of Ravago Manufactured Products, Dmytruk had access to confidential information and trade secrets used within the various Ravago divisions, including resale and distribution. Dmytruk had access to all aspects of the Ravago business by virtue of this new position.

14. On August 7, 2018, Dmytruk resigned from Ravago.

15. In or about July 2012, Ravago issued Dmytruk a MacBook computer and a "LaCie" brand hard drive.

16. Before returning his computer to Ravago on August 9, 2018, Dmytruk erased approximately five years' worth of business communications and other confidential information by restoring the computer to a prior backup point. Dmytruk had backed up his computer at least 33 times since 2012 to the LaCie hard drive. The last time Dmytruk backed up his computer was the day before he resigned.

3

17.   At the time of and following his resignation, Dmytruk did not return any hard drives to Ravago. Dmytruk did not return a LaCie hard drive to Ravago.

18.   By taking the LaCie hard drive, to which he had backed up his work computer on August 6, 2018, Dmytruk was able to take all of the confidential information regarding Ravago's business on his computer as of the date of each of the backup points, including but not limited to his e-mails, presentations, financial information, employee information, customer information, and supplier information.

19.   Ravago issued Dmytruk a company cellphone while he was employed by Ravago. Before returning his company cellphone to Ravago, Dmytruk deleted text messages and, upon information and belief, other company-related information.

20.   After resigning from Ravago, Dmytruk remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

21.   On August 12, 2018, Vinmar International, Ltd. ("Vinmar"), a direct competitor of Ravago, announced that it hired Dmytruk to lead its new polymer division, Vinmar Polymers America, LLC ("VPA"). Dmytruk joined VPA on August 14, 2018. Prior to Vinmar hiring Dmytruk, Dmytruk's only commercial-related experience in the plastics industry was with Ravago.

22.   VPA was formed as a Texas Limited Liability Company on or about July 10, 2018.

23.   Dmytruk currently is employed as a President of VPA.

24.   Dmytruk works for VPA in Texas.

25.   Dmytruk lives in his home in Spring, Texas, with his wife and children.

## OTHER KEY PLAYERS

26. Hermant Goradia ("H. Goradia") is Vinmar's President.

27. H. Goradia is a manager of VPA.

28. Dmytruk and H. Goradia had multiple communications with one another while Dmytruk was an officer of Ravago, during work hours, and using the Ravago-issued mobile telephone to Dmytruk.

29. Vishal Goradia ("V. Goradia") is Vinmar's Senior Vice President. As Senior Vice President for Vinmar, V. Goradia has responsibility for Plastics, Plastics Supply Chain, and Specialty Chemicals distribution for Vinmar.

30. V. Goradia is a manager of VPA.

31. Dmytruk and V. Goradia had multiple communications with one another while Dmytruk was an officer of Ravago, during work hours, and using the Ravago-issued mobile telephone.

32. Kevin Page is Vice President of Vinmar. In his capacity as Vice President of Vinmar, Page engaged in multiple communications with Ravago employees, including Dmytruk, before August 2018.

33. Tom Cassel is a Director at Vinmar.

34. In his capacity as a Director for Vinmar, since September 2018, Cassel has attempted to recruit multiple Ravago employees to work for Vinmar or VPA. Upon information and belief, Cassel obtained the information to recruit these individuals from Dmytruk.

35. Jeff Siebenaller is a former employee of Ravago.

36.   Siebenaller and Dmytruk had frequent communications, both while employed by Ravago and in relationship to Siebenaller and Dmytruk joining VPA.

37.   After Siebenaller left Ravago, he joined VPA as a consultant, commencing on September 4, 2018. Upon information and belief, Siebenaller reports to Dmytruk now.

38.   John Ward is a former employee of Ravago in its Muehlstein division. He resigned from Ravago on September 14, 2018. Prior to resigning from Ravago, Ward erased the entirety of his Ravago-issued computer.

39.   In the several weeks before Dmytruk announced he was resigning, Ward and Dmytruk spoke multiple times for hundreds of minutes of calls.

40.   After leaving Ravago, as of September 17, 2018, Ward joined VPA as Business Director, Polypropylene & Polyethylene Durables. Upon information and belief, Ward reports to Dmytruk now.

41.   Daniel Peretz is a former employee of Ravago Canada Co.

42.   Ravago Canada Co. is an affiliate of the plaintiff here.

43.   On October 9, 2018, Peretz gave notice of his resignation from Ravago. He informed management that he was going to work for the Vinmar Group. While at Ravago, Peretz worked closely with Dmytruk and Ward, his former boss.

44.   Upon his departure, Peretz took 80 confidential Ravago files. Litigation is ongoing in Canada as a result.

45.   Peretz uploaded Ravago confidential information to an unauthorized iCloud account.

46.   Following his joining Vinmar, Peretz contacted Plaintiff's employees, soliciting them for employment for VPA, including a recent solicitation to a West Coast

salesperson based in the United States. Upon information and belief, Peretz coordinated this solicitation for employees with Dmytruk.

## JURISDICTION AND VENUE

47. This Court has federal question jurisdiction over this matter, pursuant to 28 U.S.C. § 1331, because Ravago asserts claims against Dmytruk under the Defense Trade Secrets Act of 2016, 18 U.S.C. § 1836(c), and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

48. This Court has supplemental jurisdiction over Ravago's remaining state law claims, pursuant to 28 U.S.C. § 1367.

49. This Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. Ravago is a citizen of Delaware and Florida under 28 U.S.C. § 1332(c). Dmytruk is a citizen of Texas.

50. Dmytruk's Agreement provides for exclusive jurisdiction in the state or federal courts in Connecticut.

51. The Agreement states as follows:

The parties agree that this Agreement is to be governed by and construed under Connecticut law and further agree that any claims or causes of action which arise out of this Agreement shall be instituted and litigated only in a court of competent jurisdiction located within the State of Connecticut. The Employee hereby consents to the jurisdiction of the state and federal courts located in the State of Connecticut for the resolution of any dispute regarding or arising out of this Agreement.

(Ex. A § 17.)

52. Ravago asserts claims against Dmytruk regarding or arising out of the Agreement.

53.     This is a court of competent jurisdiction located within the State of Connecticut.

54.     Ravago's claims include breach of contract by virtue of misappropriating confidential information and trade secrets, as well as statutory claims for misappropriation of trade secrets and tort claims for breach of fiduciary duty arising out of or related to Dymtruk's employment.

55.     Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because Dmytruk is subject to the personal jurisdiction of this Court. Dmytruk also agreed to venue in this jurisdiction.

## FACTS

**Dmytruk's Agreement**

56.     Dmytruk's Agreement is an enforceable contract between him and "Muehlstein Administrative Services LLC, its successors and any of its current or future divisions, subsidiaries, affiliates or related organizations." (Ex. A at 1.)

57.     Dmytruk specifically agreed as follows:

SUCCESSORS
This Agreement shall be binding upon and inure to the benefit of Muehlstein and its successors and assigns, and the Employee, his/her heirs, executors and administrators. Muehlstein shall have the right to assign this Agreement to a successor to all or substantially all of the business or assets of Muehlstein or any division or part of Muehlstein with which employee is employed at any time.

(Ex. A § 14.)

58.     Dmytruk is bound by the Agreement.

59.     Ravago is entitled to enforce the Agreement against Dmytruk. The Agreement was assigned to Ravago when it acquired Muehlstein, pursuant to Section 14 of the Agreement expressly authorizing the same. Dmytruk's Agreement is enforceable by

Ravago as a successor to Muehlstein Administrative Services LLC. Muehlstein currently operates as a division of Ravago.

60.  In the Agreement, Dmytruk agreed that Ravago, as successor to Muehlstein, is "engaged in the highly competitive business of distributing plastic and rubber raw materials and compounds." (Ex. A § 1.)

61.  In the Agreement, Dmytruk agreed that Ravago, as successor to Muehlstein, expended "substantial amounts of money and the use of skills developed over a long period of time." (Ex. A. § 1.)

62.  In the Agreement, Dmytruk agreed that Ravago, as successor to Muehlstein, "has developed and will continue to develop certain valuable trade secrets, confidential information and inventions that are peculiar to [its] business and the disclosure of which would cause [Ravago, as successor to Muehlstein,] great and irreparable harm. (Ex. A. § 1.)

63.  Ravago operates in a highly competitive market with narrow profit margins.

64.  Both pricing and personal relationships are very important to Ravago.

65.  Dmytruk is a former employee who has specialized knowledge of Ravago's internal strategy, pricing structure and supplier and customer relations.

66.  The restrictions in the Agreement are reasonably tailored to protect Ravago's business from a defalcating employee.

67.  The restrictions in the Agreement are reasonable as to Dmytruk, who was an officer of Ravago.

68.  The Agreement differentiates between "Trade Secrets" and "Confidential Information."

9

69.     The Agreement defines "Trade Secrets" as "any scientific or technical information, design, process, procedure, formula or improvement that is valuable and not generally known to [Ravago's] competitors. To the fullest extent consistent with the foregoing, Trade Secrets shall include, without limitation, all information and documentation, whether or not patented, copyrighted or trademarked, pertaining to the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning [Ravago's] products and services." (Ex. A § 1(a).)

70.     The Agreement defines "Confidential Information" as follows:

(b)     The term "Confidential Information" means any data or information and documentation, other than Trade Secrets, which is valuable to [Ravago] and not generally known to the public, including but not limited to:

   i)     **Product information**, including but not limited to designs, specifications, modifications, advancements and discoveries;

   ii)    **Financial information**, including but not limited to earnings, assets, debts, prices, fee structures, volumes of purchases or sales, or other financial data, whether relating to [Ravago] generally, or to particular products, services, geographic areas, or time periods;

   iii)   **Supply and service information**, including but not limited to information concerning the goods and services used or purchased by [Ravago], the names and addresses of suppliers, terms of supplier service contracts, or of particular transactions, or related information about potential suppliers, to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of particular suppliers, though generally known or available, yields advantages to [Ravago] the details of which are not generally known;

   iv)    **Marketing information**, including but not limited to details about ongoing or proposed marketing programs or agreements by or on behalf of [Ravago], marketing forecasts, results of marketing efforts or information about impending transactions;

   v)     **Personnel information**, including but not limited to employees' personal or medical histories, compensation or other terms of employment, actual or proposed promotions, hiring, resignations, disciplinary actions, terminations or reasons

therefore, training methods, performance or other employee information;

vi)    **Customer information**, including but not limited to any compilations of past, existing or prospective customers, customer proposals or agreements between customers and [Ravago], status of customer accounts or credit, or related information about actual or prospective customers; and

vii)    **Business information**, including but not limited to business plans, minutes of board meetings, financial reports, strategic plans, operations manuals and best practices memoranda.

(Ex. A § 1(b) (emphasis added).)

71.    Dmytruk agreed that he would not,

while employed by [Ravago] and for so long thereafter as the pertinent information or documentation remains a Trade Secret, directly or indirectly use, disclose or disseminate to any other person, organization or entity or otherwise employ any Trade Secret. The Employee further agrees, except as specifically required in the performance of his/her duties for [Ravago], that he/she will not, while employed by [Ravago] and for two (2) years after his/her employment has ceased, disclose or disseminate to any other person, organization or entity or otherwise employ any Confidential Information. Nothing in this paragraph shall preclude the employee from disclosing or using Trade Secrets or Confidential Information if (a) the Trade Secrets or Confidential Information have become generally known, at the time the Trade Secrets or Confidential Information are used or disclosed, to the public or to competitors of [Ravago] through no act or omission of the Employee or (b) the disclosure of the trade secrets or confidential information is required to be made by any law, regulation, governmental body or authority, or court order.

(Ex. A § 3.)

72.    Dmytruk also agreed that he would return all company property, specifically:

The Employee agrees that he/she will deliver to [Ravago] upon the conclusion of his/her employment, and at any other time upon [Ravago's] request, all memoranda, notes, records, computers, computer programs, computer files, computer disks, drawings or other documentation, and all copies thereof, in his/her possession, custody or control, whether made or compiled by the Employee alone or with others or made available to him/her while employed by [Ravago]. The Employee further agrees to sign a statement verifying that he/she has returned all such property.

(Ex. A § 4.)

73.     Dmytruk agreed to devote his efforts to working for Ravago. The Agreement provided:

> The Employee agrees to devote his/her best efforts to the services of [Ravago] in such capacity as [Ravago] from time to time shall direct. The Employee further agrees that while employed by [Ravago] he/she will not have any direct or indirect financial interest in any entity reasonably deemed to compete with [Ravago] with the exception of shares in publicly-traded companies.

(Ex. A § 6.)

74.     Dmytruk agreed not to solicit Ravago customers and suppliers:

> NON-SOLICITATION OF CUSTOMERS & SUPPLIERS
> (a)     The Employee agrees that while employed by [Ravago], he/she will become intertwined with [Ravago]'s goodwill by having contact with and becoming aware of some, most or all of [Ravago]'s customers, representatives of those customers, suppliers, representatives of those suppliers, their names and addresses, specific customer and supplier needs and requirements, and leads and references to prospective customers. The Employee will also become privy to [Ravago]'s trade secrets and confidential information. The Employee further agrees that loss of such goodwill, trade secrets, confidential information, customers and/or suppliers will cause [Ravago] great and irreparable harm.
>
> (b)     The Employee agrees that for eighteen (18) months after the conclusion of his/her employment he/she will not directly or indirectly solicit, contact, call upon, communicate with or attempt to communicate with any customer, former customer, prospective customer, supplier, former supplier or prospective supplier of [Ravago] for the purpose of providing or obtaining any product or service reasonably deemed competitive with any product or service then offered by [Ravago]. This restriction shall apply only to:
>> i)     any customer, former customer, prospective customer, supplier, former supplier or prospective supplier of [Ravago] with whom the Employee had contact during the last twelve months of his/her employment with [Ravago], or
>> ii)     any customer, former customer, prospective customer, supplier, former supplier or prospective supplier of [Ravago] for which the Employee has obtained confidential information, as defined by this Agreement, during the last twelve months of his/her employment with [Ravago].
>
> For the purposes of this paragraph, "contact" means interaction between the Employee and the customer, former customer, prospective customer, supplier, former supplier or prospective supplier which takes place to further the business relationship, or performing services for the customer, former customer,

prospective customer, supplier, former supplier or prospective supplier on behalf of [Ravago].

(Ex. A § 7.)

75. Dmytruk agreed not to solicit Ravago employees:

NON-SOLICITATION OF EMPLOYEES
The Employee agrees that while employed by Muehlstein and for eighteen (18) months after the conclusion of his/her employment he/she will not directly or indirectly recruit, hire or attempt to recruit or hire any other employee of Muehlstein with whom the Employee had contact during his/her employment with Muehlstein. For the purposes of this paragraph, "contact" means any interaction whatsoever between the Employee and the other employee.

(Ex. A § 8.)

**Pre-resignation Communications Between Dmytruk and Vinmar**

76. Beginning in at least 2017, Siebenaller and Dmytruk began corresponding through e-mail and telephone with H. Goradia, V. Goradia, and Page to set up a meeting between Siebenaller, Dmytruk and these Vinmar representatives in Houston.

77. A true and correct copy of an e-mail chain coordinating this meeting between Siebenaller, Dmytruk, H. Goradia, V. Goradia, and Page are attached hereto and incorporated herein as Exhibit B. There was no Ravago-related business reason for this meeting.

78. In 2017 and prior to September 24, 2018, H. Goradia's mobile telephone number was 832-875-3501.

79. In 2017 and prior to August 7, 2018, Dmytruk's mobile telephone number was 770-331-1835. During his employment with Ravago, Dmytruk used this mobile telephone number on behalf of Ravago and Ravago paid the costs of this phone.

80.    In 2017 and prior to September 7, 2018, Siebenaller's mobile telephone number was 904-583-7757. During his employment with Ravago, Siebenaller used this mobile telephone number on behalf of Ravago and Ravago paid the costs of this phone.

81.    Dmytruk called H. Goradia twice in October 2017.

82.    Dmytruk called H. Goradia from 770-331-1835 seven times in 2018 (while still employed with Ravago), for a total number of 163 minutes of phone conversations.

83.    There was no legitimate Ravago-related business reason for Dmytruk to have these telephone conversations with H. Goradia.

84.    Vinmar's main office telephone number is 281-618-1340.

85.    Dmytruk called Vinmar's main office from 770-331-1835 twice in 2018, once in May and once in June; both calls were placed while Dmytruk still worked for Ravago.

86.    True and correct logs of telephone calls among the telephone numbers identified in Paragraphs 79, 82, and 85 above are attached as Exhibit C and incorporated herein.

87.    On September 20, 2017, Dmytruk and Siebenaller each flew to Houston, Texas, to meet with H. Goradia.

88.    On September 21, 2017, Dmytruk, Siebenaller, and H. Goradia met at Vinmar's headquarters and a restaurant called Via Emilia.

89.    On November 20 and 21, 2017, Siebenaller and Dmytruk exchanged e-mails discussing H. Goradia. In the e-mail exchange, Dmytruk told Siebenaller that H. Goradia wanted to meet with Dmytruk in December of that year. Siebenaller asked Dmytruk if he was still in discussions with H. Goradia, "OTR [off the record] of course."

14

90.   A true and correct copy of the November 20-21 e-mail exchange between Siebenaller and Dmytruk is attached hereto and incorporated herein as Exhibit D.

91.   On or before December 7, 2017, Dmytruk received an offer from the Vinmar Group.

92.   On February 25, 2018, someone using Dmytruk's mobile number called H. Goradia's mobile number. Upon information and belief, Dmytruk called H. Goradia.

93.   That same evening at 8:40 P.M. Eastern Time, someone using H. Goradia's mobile number called Dmytruk's mobile number. Upon information and belief, H. Goradia returned Dmytruk's call. This telephone call lasted 24 minutes.

94.   On March 28, 2018, Dmytruk flew from Florida to Houston and stayed at a hotel located near Vinmar's headquarters.

95.   A true and correct copy of Dmytruk's hotel bill from that stay is attached hereto and incorporated herein as Exhibit E.

96.   On March 28, 2018, Dmytruk accepted a promotion from Ravago to become the Vice President of RMA, effective May 1, 2018.

97.   After accepting the promotion, Dmytruk continued to communicate with H. Goradia, and, upon information and belief, others from Vinmar. There was no Ravago-related business reason for Dmytruk to do so.

98.   After accepting the promotion at Ravago, Dmytruk also continued to communicate with Ravago suppliers and customers even though he had no Ravago-related business reason to do so.

99.   On April 4, 2018, H. Goradia e-mailed Siebenaller to tell him that retirement was outdated. Siebenaller responded that "perhaps the spelling is re-hiremont." Siebenaller forwarded a copy of this e-mail to Dmytruk.

100. A true and correct copy of the e-mail from Siebenaller to Dmytruk is attached hereto and incorporated herein as Exhibit F.

**June 2018 Ravago Board Meeting and Subsequent Call between Vinmar and Dmytruk**

101. On June 19 and 20, 2018, Dmytruk attended Ravago's annual board and business strategy meeting ("Board Meeting").

102. Attendees to the Board Meeting included Ravago executives, including the Chief Executive Officer, Jim Duffy, as well as affiliate company officers from Europe.

103. During the Board Meeting, the attendees discussed highly confidential trade secrets and other proprietary business information. The meeting included a PowerPoint presentation that conveyed information regarding revenue, sales, customers, business planning, and financing strategies ("Board Meeting PowerPoint Presentation").

104. The person presenting the Board Meeting PowerPoint Presentation during the Board Meeting told attendees that a copy of the Board Meeting PowerPoint Presentation would be sent to the attendees.

105. During the Board Meeting, attendees saw Dmytruk taking pictures of the Board Meeting PowerPoint Presentation on his mobile phone.

106. At 5 P.M. on June 20, 2018, after the Board Meeting ended, someone called Dmytruk's mobile number from 281-618-1374 ("June 20 Call"). Upon information and belief, 281-618-1374 is a telephone number assigned to Vinmar. Upon information and belief, the June 20 Call was between H. Goradia and Dmytruk. The June 20 Call lasted 85 minutes. There was no Ravago-related business reason for Dmytruk to conduct this call.

107.   Following the board meeting, Dmytruk conducted several internet searches to learn how to erase documents from his Ravago-issued MacBook computer and Ravago-issued iPhone.

108.   In the weeks that followed, Dmytruk became very elusive and stopped performing his Vice President duties.   Dmytruk failed to return telephone calls and missed important meetings with all levels of personnel, including a [meeting/call] scheduled for [date] with Ravago's Chief Executive Officer.

109.   In 2018, Ward's mobile telephone number was 330-283-3215. During his employment with Ravago, Ward used this mobile telephone number on behalf of Ravago.

110.   Dmytruk spoke with Ward multiple times in the weeks prior to his resignation from Ravago. Between June 8, 2018, and July 23, 2018, the telephone numbers assigned to Dmytruk and Ward shared 480 minutes of connectivity. Upon information and belief, Dmytruk and Ward were using the telephones to communicate. Upon information and belief, Dmytruk and Ward communicated during this time through means other than mobile telephone conversations, including text messages and e-mail.

111.   A true and correct log of telephone calls between Dmytruk's and Ward's assigned telephone numbers between June 8, 2018 and July 23, 2018 is attached hereto and incorporated herein as Exhibit G.

112.   There was no legitimate Ravago-related business reason for extensive communications between Dmytruk and Ward between June 8, 2018 and July 23, 2018. Upon information and belief, Ward had no prior contact with Vinmar, and Dmytruk was soliciting and recruiting Ward to join Vinmar.

113.   On July 13, 2018, Siebenaller "retired" from Ravago.

114.   On August 7, 2018, Dmytruk resigned from Ravago.

115.   On August 12, 2018, VPA publicly announced Dmytruk's new position.

116.   On September 14, 2018, Ward joined VPA.

**Ravago's Business**

117.   Ravago outperforms peer companies through highly confidential processes and systems in all three segments of the industry: suppliers, logistics, and customers.

118.   The "supplier" segment of the business involves Ravago purchasing a broad spectrum of resin grades from manufacturers (the suppliers), which Ravago needs for product to sell to end-user customers.

119.   Ravago's supplier sector is built upon its relationship with suppliers, which Ravago devotes significant time, money and resources to develop. These critical supplier relationships result in confidential information, including but not limited to pricing, material, volume commitments, logistics, and Ravago business models tailored to the commercialization of supplier products.

120.   Ravago takes steps to protect and hold aspects of its supplier business, such as the identities of its top suppliers, the volumes purchased, business models, pricing, and logistics for transferring the resin from the supplier to Ravago and then to the end user, as confidential.

121.   Ravago's supplier confidential information is entrusted to only a select group of individuals within the company and is not generally known in the market. Supplier information is maintained in a database and Excel spreadsheets. If a competitor had access to the confidential aspects of the supplier segment, including the information in the database or the Excel spreadsheets, a competitor could purchase the resin from

the suppliers and deny the availability of resin to Ravago, which would limit its ability to sell resin to Ravago's customers.

122.   During his employment with Ravago, Dmytruk had direct access to the Ravago confidential information relating to the supplier segment of Ravago's business. Dmytruk had access to the database, as well as Excel spreadsheets containing supplier information.

123.   During his employment with Ravago, Dmytruk had direct access to the Ravago trade secrets relating to the supplier segment of Ravago's business.

124.   The supply chain segment involves operations and businesses deployed by Ravago to transport and store products from the point of delivery from suppliers to delivery locations for customers.

125.   Ravago's supply chain sector relies upon confidential information and trade secrets, which include pricing agreements with logistics providers in the warehousing, freight, trucking, and rail industries.

126.   Ravago's supply chain segment includes confidential and trade secret information that is entrusted to only a select group of individuals within the company, is protected by non-disclosure agreements, and is not generally known in the market.

127.   During his employment with Ravago, Dmytruk was privy to the Ravago confidential information regarding Ravago's supply chain segment, information that was protected from disclosure by the Agreement.

128.   During his employment with Ravago, Dmytruk was privy to the Ravago trade secrets regarding Ravago's supply chain segment, information that was protected from disclosure by the Agreement.

129.    The logistics involved in the supply chain are key to Ravago's business because it involves how Ravago contracts with trucking companies and manages delivery. If it were to lose truck capacity to a competitor, Ravago would lose business.

130.    The customer segment of the Ravago business is the channel it uses to sell products to customers.

131.    Ravago's customers' sector is based upon unique pricing, financing, and credit strategies, and a broad portfolio of confidential and trade secret customer lists.

132.    Ravago's customer information and strategies are entrusted to only a select group of individuals within the company and are not generally known in the market.

133.    During his employment with Ravago, Dmytruk had direct access to the Ravago confidential information relating to the supplier segment of Ravago's business.

134.    During his employment with Ravago, Dmytruk had direct access to the Ravago trade secrets relating to the supplier segment of Ravago's business.

**Ravago Confidential Information**

135.    In the Agreement, Dmytruk acknowledged that the following types of Ravago information are confidential: product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, including but not limited to the information identified in Paragraphs 118 to 127 above ("Ravago Confidential Information").

136.    In the Agreement, Dmytruk promised not to disclose Ravago Confidential Information.

137.    During his employment with Ravago, Dmytruk had access to Ravago Confidential Information, namely its product information, financial information, financing strategies, supply and service information, marketing information, personnel

information, supplier information, customer information, and business information, including but not limited to the information identified in Paragraphs 118 to 127 above.

138. Ravago's sales strategies and pricing methodologies are within Ravago Confidential Information. Ravago's sales strategies and pricing methodologies include Ravago's competitive research and strategies for market differentiation, product implementation, deployment strategy, and price lists. This information is protected within Ravago and is not available to all employees. Dmytruk had access to Ravago's sales strategies and pricing methodologies.

139. Ravago employs investment bankers to research and monitor the markets in which it conducts business to be used in its procurement and sales strategies deployed globally. Work product generated by these investment bankers is treated as confidential and not shared publicly. Dmytruk had access to this information while employed by Ravago. This type of information was disclosed during the Board Meeting and in the Board Meeting PowerPoint Presentation under expectations of confidentiality.

140. Ravago treats its customers' information as confidential information. Only a select group of employees have access to customer information. At the time of his resignation, Dmytruk had access to all customer information.

**Ravago Trade Secrets**

141. During his employment with Ravago, Dmytruk had access to "the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning [Ravago's] products and services." Dmytruk also had access to Ravago customer lists, which are compilations of customer

information (together with the agreement definition "Ravago Trade Secrets"). Dmytruk agreed that these items are trade secrets belonging to Ravago.

142.    Dmytruk agreed not to disclose the Ravago Trade Secrets.

### Customized Facilities and Operations

143.    Ravago has built specialized facilities that contain customized systems and operations that improve the efficiency of its warehousing, transloading, blending, debagging, and bagging operations and that give Ravago a competitive advantage ("Ravago Systems").

144.    Ravago owns the Ravago Systems, which it developed.

145.    For example, Ravago's Baytown location is a specialized facility that contains Ravago Systems.

146.    Dmytruk has visited the Baytown location and knows the details of the Ravago Systems.

147.    For example, to get into the Ravago Baytown facility, whether or not employed by Ravago, everyone is required to sign a non-disclosure agreement and photographs are not allowed. Dmytruk signed the Baytown non-disclosure agreement when he visited Baytown.

148.    Vinmar built a facility right next to Baytown.

149.    A true and correct aerial photograph showing the proximity of the two facilities is attached hereto and incorporated herein as Exhibit H.

### Proprietary Formulas and Processes

150.    Ravago's manufacturing division developed proprietary formulas and processes to manufacture and sell a portfolio of plastic resin and rubber materials ranging from

high performance engineered resins to recycled post-consumer materials that give Ravago a competitive advantage ("Ravago Manufactured Products").

151. Ravago owns the Ravago Manufactured Products it developed.

152. Ravago limits access to the formulas and processes for creating the Ravago Manufactured Products to a limited number of employees, including using network file locations that have limited access rights and requiring that confidentiality agreements be signed by third parties prior to entering into Ravago manufacturing facilities.

153. For example, Ravago's Brighton, Michigan and Manchester, Tennessee facilities manufacture reactor and post-industrial recycle nylon 6 & 6.6 product family, which is sold under Ravago's Hylon® brand.

154. Dmytruk, in his capacity as Vice President of Ravago's manufacturing group, knows the details of how Ravago Manufactured Products are created, and, upon information and belief, had copies of product formulas on the LaCie hard drive.

155. Vinmar has an affiliate company, Goradia Capital LLC, which was created for the purposes of acquiring petrochemical manufacturing assets, which would be a direct competitor to Ravago's manufacturing business.

156. VPA, and its affiliated companies, have existing relationships with petrochemical manufacturing companies that manufacture products competitive with Ravago Manufactured Products.

### *Ravago Software*

157. Ravago uses software to manage the various segments of its business.

158.   Dmytruk was part of a working group within Ravago that provided feedback to Ravago programmers to develop various aspects of software used within Ravago's business.

159.   As part of the working group, Dmytruk participated in calls and presentations and he had access to e-mails and other documentation regarding the features and capabilities of the software.

160.   The software, as customized by Ravago programmers, is shared only with employees who need the software to do their work. The software is not shared outside of the business.

161.   The software's features and capabilities are valuable, proprietary, and confidential information that, if wrongfully disclosed, would enable a competitor to more effectively target its customers by understanding their needs. Such information includes, but is not limited to, the features and specifications of the customized software Ravago has invested substantial sums in developing and maintaining and the terms of the agreements between Ravago and its customers ("Ravago Customer Software").

162.   Access to the system is limited to a select group of employees because it reveals Ravago's strategies for assessing and considering risk in order to manage credit, which is a key competitive advantage for Ravago in the market.

### *Ravago Customer Lists*

163.   In addition to customer information maintained in its software, Ravago divisions keep customer lists on Excel spreadsheets to use in day-to-day business.

164.    Dmytruk, from his work in the Muehlstein division and other divisions, had access to those customer lists and he would have had copies of the lists on his Ravago-issued computer.

165.    The customer lists are compilations that derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, a competitor. For example, if a competitor had Ravago's customer list, it could solicit customers easily in a market where customers are not readily identifiable by having access to purchasing history, forecasted volumes, and knowledge and contact information for procurement decision makers.

**Ravago Takes Reasonable Measures to Protect Ravago Confidential Information and Ravago Trade Secrets.**

166.    Ravago employs physical protection at its work sites, including facility access controls.

167.    Entry to Ravago's offices and facilities is limited to authorized-personnel only.

168.    Ravago does not allow any non-employee to access its computer systems.

169.    Ravago requires employees to change computer access passwords every four months.

170.    Employee access to information stored on Ravago's computer servers is limited by the job duties assigned to the particular employee.

171.    Ravago employees are issued a company computer, hard drive, and cellphone, each of which must be returned upon the employees' departure from the company.

172.    As a condition of employment and the use of the above stated company technology, all employees are bound by the Employee Handbook, which prohibits the disclosure, deletion, or destruction of any files or data from Ravago-issued devices.

173.   Ravago has employees sign Non-Disclosure Agreements. Dmytruk's Agreement includes non-disclosure obligations.

174.   After resigning from Ravago, Dmytruk remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

175.   Ravago employees (other than information technology professionals) do not have access to the Wi-Fi network password and cannot connect devices to the Ravago network at its offices.

**Dmytruk Misappropriates Ravago Confidential Information and Ravago Trade Secrets**

176.   Upon information and belief, during the communications among H. Goradia, V. Goradia, Page, other employees of Vinmar, and Dmytruk, including the June 20 Call, in the period before Dmytruk resigned, Dmytruk verbally relayed Ravago's confidential information and trade secrets to Vinmar or its representatives.

177.   Upon information and belief, Dmytruk used other communication means to transfer Ravago's confidential information and trade secrets to Vinmar or its representatives.

178.   During his employment, Dmytruk was issued (a) a MacBook computer; (b) a LaCie hard drive; and (c) a mobile phone. Upon resignation, Dmytruk did not return the LaCie hard drive to Ravago.

179.   In June of 2018, prior to returning his computer and phone to Ravago, Dmytruk conducted several searches on his Ravago-issued computer for how to delete computer files from his computer and pictures from his phone.

180.   On or about August 7, 2018, the day Dmytruk resigned from Ravago, Dmytruk conducted additional Internet searches about how to delete files from a phone and computer.

26

181.  Dmytruk backed up his Ravago-issued computer over thirty times to a LaCie hard drive, including on August 6, 2018—the day before he resigned from Ravago. This last backup created an entire image of his Ravago computer and copied all of the files and e-mails from the computer to his LaCie hard drive.

182.  Dmytruk then erased the computer and returned it to a point in time of January 2013, using the system restore process. The system restore process occurred on August 7, 2018 at 1:37 P.M., erased all data from the system, and overwrote the computer's drive contents with the contents of the restore point in January 2013. Doing this erase-and-restore had the effect of deleting five years' worth of Ravago information from Dmytruk's computer.

183.  On August 9, 2018, Dmytruk met with a Ravago employee to return his company-issued technology.

184.  In direct violation of the Employee Handbook, Dmytruk selectively deleted text messages with Siebenaller and Ward from his company-issued mobile phone.

185.  Forensic analysis shows that Dmytruk deleted 123 call log entries, 209 chats, 41 notes, 2710 web history items, and 50 searched items from his Ravago-issued cellphone and laptop. His deleted entries include "how to delete all your photos at once on an iphone" and "how to wipe your macbook air clean before you sell."

186.  Despite being required to do so, Dmytruk did not return his company-issued LaCie hard drive.

187.  The missing LaCie hard drive has access to over thirty copies of Dmytruk's Ravago computer and all of its files as it existed on unique dates and times during his employment.

188.   Each of the backup copies of Dmytruk's computer on the LaCie hard drive contains confidential and trade secret information that was stored on Dmytruk's MacBook at the time of each backup. This information includes all e-mails, documents, files, images, chat conversations, applications, and settings of the computer.

189.   Upon information and belief, the backup copies of Dmytruk's Ravago computer contained on the LaCie hard drive are in Dmytruk's possession, custody, or control.

**Threatened Continued Misappropriation**

190.   Dmytruk is now leading VPA as its President. Upon information and belief, as his role as President of VPA, Dmytruk is actively involved in the Vinmar business and the business of VPA affiliates. VPA, and its affiliated companies, are in the business of competing with Ravago.

191.   After resigning from Ravago, Dmytruk remains subject to a duty not to use trade secrets, or other confidential information, which he has acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

192.   Because Dmytruk continues to have access to Ravago Confidential Information, it is inevitable that Dmytruk will use that information to Ravago's harm.

193.   Because Dmytruk continues to have access to Ravago Confidential Information, there is a real threat of continued or future misappropriation by Dmytruk of Ravago's confidential information.

194.   Because Dmytruk continues to have access to Ravago Trade Secrets, it is inevitable that Dmytruk will use that information to Ravago's harm.

195.   Because Dmytruk continues to have access to Ravago Trade Secrets, there is a real threat of continued or future misappropriation by Dmytruk of Ravago's confidential information.

**Ravago Suffers Irreparable Harm.**

196.  Upon information and belief, Dmytruk used and continues to use Ravago confidential information to assist VPA, and affiliated companies, in directly competing with Ravago.

197.  Upon information and belief, Dmytruk used and continues to use Ravago trade secrets to assist VPA, and affiliated companies, in directly competing with Ravago.

198.  Ravago is the owner of the Ravago Confidential Information.

199.  Ravago is the owner of the Ravago Trade Secrets.

200.  The Ravago Confidential Information is valuable to a competitor because it would enable the business to copy such models, methods, and strategies to compete directly with Ravago. This would give the competitor an advantage. VPA, and its affiliated companies, are competitors.

201.  The Ravago supplier information would be highly valuable to a competitor because it would enable the business to contact suppliers with information that might not otherwise be known, leverage information unique to Ravago on volume, pricing, and commercialization strategies, and divert supply from Ravago, which would hurt the rest of Ravago's business.

202.  The Ravago customer lists would be highly valuable to a competitor because they would enable the business to contact new customers, that might not otherwise be known, and solicit the most valuable customers first.

203.  The Ravago pricing information would be highly valuable to a competitor because it would enable such competitor to use pricing information, that might not otherwise be known, to undercut Ravago's pricing offers to its customers and take higher margin business first.

204.  Premier Polymers ("Premier") is an affiliate of VPA. VPA or Premier used Ravago Confidential Information to solicit customers it did not have previous relationships with and attempted to steal the business using knowledge of Ravago's pricing information unless Ravago cut its prices.

205.  The Ravago Systems are a Ravago Trade Secret. The Ravago Systems derive independent economic value from not being generally known to competitors because it represents a significant investment by Ravago of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Systems would be highly valuable to a competitor because it would enable the business to compete by increasing efficiency, reducing profit margins, and allowing for better logistics related value-added solutions to be provided to suppliers and customers. Ravago invested considerable time and money into developing the Ravago Systems. If a competitor would be able to use the Ravago Systems without the investment of the time and money to independently create it, the competitor would be enriched unjustly and able to compete unfairly against Ravago.

206.  The Ravago Software is a Ravago Trade Secret. The Ravago Software, or its component design and structure (even without source code), derives independent economic value from not being generally known to competitors because it represents a significant investment by Ravago of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Software would be highly valuable to a competitor because it would (i) enable the business to more accurately forecast sales and supply needs for customers; (ii) allow the business to push to sales person all information needed for a sale including purchasing history, current pricing

on available inventory, and credit rating; and (iii) provide the business a reporting tool to track and analyze pricing lanes and availability for logistics providers. If a competitor would be able to copy the Ravago Software without the investment of time and money to independently design it, the competitor would be enriched unjustly and able to compete unfairly against Ravago.

207.   The Ravago Manufactured Products are a Ravago Trade Secret. The Ravago Manufactured Products derive independent economic value from not being generally known to competitors because it represents a significant investment by Ravago of time, money, knowledge base, and resources that a competitor would need to replicate. The Ravago Manufactured Products would be highly valuable to a competitor because it would enable their business to (i) create and commercialize products that have an existing market and client base; and (ii) use manufacturing related services to offer value added services to suppliers and customers. If a competitor would be able to copy the Ravago Manufactured Products without the investment of time and money to independently design, create channels to market, and create a client base, the competitor would be enriched unjustly and able to compete unfairly against Ravago.

208.   As Dmytruk continues to use Ravago's information to directly solicit suppliers, as well as customers, and to lure employees, his conduct is having an immediate and detrimental effect on Ravago. In particular, Ravago has incurred investigation and hiring costs, has had to alter its compensation structures, expend time and energy to keep employees who are being solicited, has had to reduce its prices to keep customers and not lose business to VPA and Premier Polymers, and has had to

implement other protective means that will be more fully developed during discovery and as the case is ongoing.

209.   Ravago does not have access to the information solely in Dmytruk's possession or custody, or under his control regarding how Dmytruk has used Ravago Confidential Information and Ravago Trade Secrets to benefit himself or VPA or Vinmar. Upon information and belief, Dmytruk has disclosed Ravago Confidential Information and Ravago Trade secrets to VPA and to Vinmar, who are using that information (including information about the best employees to solicit away from Ravago) to compete with Ravago. Dmytruk is being personally compensated and is benefitting directly from his misuse of the Ravago Confidential Information and the Ravago Trade Secrets.

**Dmytruk Breaches his Agreement by Soliciting Employees.**

210.   Ravago's September 2018 telephone records show that Dmytruk, directly or indirectly, contacted several Ravago employees for the purpose of soliciting them for employment with Vinmar or VPA.

211.   In particular, upon information and belief, Dmytruk convinced Siebenaller to contact Ravago employees that Dmytruk knew would be valuable to VPA.

212.   Siebenaller met or called VPA employees to assist Dmytruk in acquiring a team of individuals from each division of Ravago's business.

213.   Upon information and belief, based on information obtained directly from Dmytruk, Cassel, the Vinmar Director, directly contacted Ravago employees in an attempt to solicit Ravago's employees to work for Dmytruk at VPA.

214.   Attached hereto and incorporated herein as Exhibit I, is a true and correct screenshot of a LinkedIn communication that Cassel had with a Ravago employee, soliciting

him, including a reference to the employee's relationship with Dmytruk, and then sending him a large gift from Texas.

215.   Vinmar has recently offered at least three additional Ravago employees employment at VPA. Upon information and belief, Vinmar obtained the information to recruit these employees directly from Dmytruk.

216.   As recently as November 23, 2018, VPA, directly or through Vinmar, continues to solicit key Ravago employees, using Peretz to recruit from Canada for United States positions.

217.   Upon information and belief, the Vinmar Group has not made similar targeted attempts to poach employees from other competitors at any point in recent time.

**Dmytruk Breaches His Agreement by Soliciting Customers.**

218.   Dmytruk's Agreement prohibits him from directly or indirectly soliciting Ravago customers.

219.   Dmytruk has either directly or indirectly contacted Ravago's customers through improper use of Ravago's customer lists obtained during his employment with Ravago.

220.   Upon information and belief, Dmytruk provided Ravago's confidential customer pricing and volume commitment information to others within Vinmar who attempted to undercut Ravago's proposed pricing and secure the customers' business, in particular, VPA's affiliate, Premier. Premier would not have had access to that confidential information but for Dmytruk providing it to them.

**Prior Litigation**

221.  On September 24, 2018, Ravago sued Dmytruk for these violations, along with other defendants, in the United States District Court for the Middle District of Florida ("First Action").

222.  Dmytruk moved to dismiss the claims there for improper venue, contending that Ravago should bring the claims in Connecticut.

223.  Ravago previously moved for injunctive relief in the First Action, and at the time of filing this Complaint, the motion had not been decided due to claims by other defendants for lack of personal jurisdiction.

224.  Ravago has acted swiftly and consistently to protect its interests in this matter.

225.  To avoid concerns surrounding any jurisdictional issues in the First Action and to address Dmytruk's venue objection (saying that Connecticut is the proper venue), Ravago brings this action solely against Dmytruk in this district.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT – CONFIDENTIAL INFORMATION

226.  Ravago incorporates Paragraphs 1 – 225 above as if fully restated herein.

227.  The Agreement, as detailed in Paragraphs 56 to 75 above and incorporated herein, restricts Dmytruk from using or disclosing Ravago Confidential Information.

228.  Dmytruk breached, and continues to breach, the Agreement by using and/or disclosing Ravago Confidential Information.

229.  In the Agreement, Dmytruk agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

230.  Dmytruk agreed as follows:

34

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

231.   As a proximate result of Dmytruk's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of its exclusive use of the Ravago Confidential Information.

232.   The balance of equities tips in Ravago's favor because Dmytruk agreed not to use Ravago's Confidential Information and Dmytruk has no reason to use Ravago's Confidential information.

233.   A preliminary and permanent injunction preventing Dmytruk from using Ravago Confidential Information is in the public interest.

234.   Ravago is entitled to a preliminary injunction preventing Dmytruk from using Ravago Confidential Information.

235.   Ravago is entitled to a permanent injunction preventing Dmytruk from using Ravago Confidential Information.

236.   In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

237.   Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

238.   Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Dmytruk's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT II
## BREACH OF CONTRACT – TRADE SECRETS

239.   Ravago incorporates Paragraphs 1 – 238 above as if fully restated herein.

240.   The Agreement, as detailed in Paragraphs 56 to 75 above and incorporated herein, restricts Dmytruk from using or disclosing Ravago Trade Secrets.

241.   Dmytruk breached, and continues to breach, the Agreement by using and/or disclosing Ravago Trade Secrets.

242.   In the Agreement, Dmytruk agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

243.   Dmytruk agreed as follows:

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

244.   As a proximate result of Dmytruk's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of its exclusive use of the Ravago Trade Secrets.

245.   The balance of equities tips in Ravago's favor because Dmytruk agreed not to use the Ravago Trade Secrets and Dmytruk has no reason to use Ravago Trade Secrets.

246.  An injunction preventing Dmytruk from using Ravago Trade Secrets is in the public interest.

247.  Ravago is entitled to a preliminary injunction preventing Dmytruk from using Ravago Trade Secrets.

248.  Ravago is entitled to a permanent injunction preventing Dmytruk from using Ravago Trade Secrets.

249.  In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

250.  Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

251.  Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Dmytruk's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT – FAILURE TO RETURN PROPERTY

252.  Ravago incorporates Paragraphs 1 – 251 above as if fully restated herein.

253.  The Agreement, as detailed in Paragraphs 56 to 75 above and incorporated herein, requires Dmytruk to deliver all of his documents and computer files to Ravago at the termination of his employment.

254.   Dmytruk breached the Agreement by destroying files on his Ravago-issued computer and iPhone, including files that were the property of Ravago.

255.   Dmytruk breached the Agreement by retaining copies of files on his Ravago computer following his resignation from Ravago.

256.   In the Agreement, Dmytruk agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

257.   Dmytruk agreed as follows:

> The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

> (Ex. A § 15.)

258.   As a proximate result of Dmytruk's conduct in retaining copies of files from his Ravago computer, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of its sole use of the Ravago Confidential Information, Ravago Trade Secrets, and any other business information Dmytruk took.

259.   The balance of equities tips in Ravago's favor because Dmytruk agreed to return the Ravago files and information and Dmytruk has no legitimate claim to retain the information.

260.   A preliminary and permanent injunction requiring Dmytruk to return the files and information from the computer is justified as specific performance of the terms of the Agreement.

261.   In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

262.   Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

263.   Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Dmytruk's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT IV
## BREACH OF CONTRACT – EMPLOYEE SOLICITATION

264.   Ravago incorporates Paragraphs 1 – 263 above as if fully restated herein.

265.   The Agreement, as detailed in Paragraphs 56 to 75 above and incorporated herein, prohibits Dmytruk from soliciting, directly or indirectly, Ravago employees.

266.   Dmytruk breached, and is continuing to breach, this section of the Agreement by directly and indirectly recruiting and attempting to recruit current Ravago employees, including the recruitment of Siebenaller and Ward.

267.   In the Agreement, Dmytruk agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

268.   Dmytruk agreed as follows:

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate

39

remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

269.   As a proximate result of Dmytruk's conduct in soliciting, directly or indirectly, Ravago's employees, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of customer relationships.

270.   The balance of equities tips in Ravago's favor because Dmytruk agreed not to solicit, directly or indirectly, Ravago's employees, and Dmytruk has no legitimate reason to seek to poach Ravago employees in violation of his Agreement.

271.   A preliminary and permanent injunction requiring Dmytruk to return the files and information from the computer is justified as specific performance of the terms of the Agreement.

272.   In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

273.   Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

274.   Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Dmytruk's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

**COUNT V**
**BREACH OF CONTRACT – CUSTOMER SOLICITATION**

275. Ravago incorporates Paragraphs 1 – 274 above as if fully restated herein.

276. The Agreement, as detailed in Paragraphs 56 to 75 above and incorporated herein, prohibits Dmytruk from soliciting, directly or indirectly, Ravago customers.

277. Dmytruk breached, and is continuing to breach, this section of the Agreement by directly and indirectly soliciting Ravago customers.

278. In the Agreement, Dmytruk agreed that injunctive relief was appropriate in the event of any breach or threatened breach of the Agreement.

279. Dmytruk agreed as follows:

The Employee understands, acknowledges and agrees that in the event of a breach or threatened breach of any of the covenants and promises contained in this Agreement [Ravago] shall suffer irreparable injury for which there is no adequate remedy at law. [Ravago] will therefore be entitled to injunctive relief from the courts, without bond, enjoining the Employee from engaging in activities in breach of the Agreement.

(Ex. A § 15.)

280. As a proximate result of Dmytruk's conduct in soliciting, directly or indirectly, Ravago's customers, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the loss of the customers, its ongoing revenue and potential to expand business.

281. The balance of equities tips in Ravago's favor because Dmytruk agreed not to solicit, directly or indirectly, Ravago's customers, and Dmytruk has no legitimate right to do so.

282. A preliminary and permanent injunction requiring Dmytruk to return the files and information from the computer is justified as specific performance of the terms of the Agreement.

283. In the alternative, if preliminary and permanent injunctive relief is not granted, then Ravago is entitled to damages in an amount to be determined at trial.

284. Ravago is entitled to an award of attorneys' fees under Section 9 of the Agreement, which provides that "[i]f Employee breaches any of the covenants set forth in this Agreement, Employee agrees to pay all costs (including reasonable attorney's fees) incurred by [Ravago] in establishing that breach and in otherwise enforcing any of the covenants or provisions of this Agreement."

285. Ravago has incurred and continues to incur costs and attorneys' fees in connection with establishing Dmytruk's breach and in enforcing the covenants and provisions of this Agreement and is entitled to a judgment in its favor in an amount to be determined at trial.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

286. Ravago incorporates Paragraphs 1 – 285 above as if fully restated herein

287. As an officer of Ravago, Dmytruk owed a fiduciary duty to Ravago. This duty includes without limitation, duties of good faith, care, and loyalty.

288. By virtue of the conduct and acts described herein, Dmytruk breached the fiduciary duties owed to Ravago.

289. As a result of Dmytruk's conduct and actions as described throughout this Complaint, Ravago has been damaged in an amount to be determined at trial.

290.   Dmytruk's actions were willful and in reckless disregard of Ravago's rights and interests, entitling Ravago to punitive damages in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF THE DEFEND TRADE SECRETS ACT

291.   Ravago incorporates Paragraphs 1 – 290 above as if fully restated herein.

292.   This is an action for injunctive relief and damages under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA").

293.   Ravago owns and possesses the Ravago Trade Secrets.

294.   Ravago's business operates in interstate commerce and it uses the Ravago Trade Secrets in interstate commerce.

295.   The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

296.   The Ravago Trade Secrets are trade secrets under the Defend Trade Secrets Act because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in 18 U.S.C. § 1839(3).

297.   As set forth herein, Ravago takes reasonable measures to keep the Ravago Trade Secrets secret.

298.   The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means to competitors.

299.   Dmytruk acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

300.   Ravago did not give permission to Dmytruk to take the Ravago Trade Secrets when he left Ravago.

301.   Dmytruk took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA and for a larger salary at VPA.

302.   Dmytruk willfully and maliciously misappropriated the Ravago Trade Secrets and continues to have them to this day.

303.   As a result of Dmytruk's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm due to its reputation and good will among its customers and suppliers. Ravago may lose customers and suppliers to competitors that it cannot recover. Without immediate and permanent injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

304.   As a result of Dmytruk's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for his prior actions, which if not enjoined, will be difficult if not impossible to measure, including loss of profits that would have been earned but for his actions. Ravago is thus entitled to preliminary and permanent injunctive relief to stop any further harm to its business, which cannot reasonably be measured, as well as to recover any monetary damages for actions taken prior to injunctive relief being granted.

305.   Dmytruk's conduct has been willful, entitling Ravago to exemplary damages under the Defend Trade Secrets Act.

## COUNT VIII
## THREATENED MISAPPROPRIATION UNDER THE DTSA

306.   Ravago incorporates Paragraphs 1 – 305 above as if fully restated herein.

307.   Under the DTSA, the Court may grant an injunction "to prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(b)(3)(A).

308.   In addition, the Court may require "affirmative actions to be taken to protect the trade secret." 18 U.S.C. § 1836(b)(3)(A)(ii).

309.   Unless enjoined, Dmytruk threatens to continue to use or disclose the Ravago Trade Secrets in his capacity as President of VPA.

310.   As a proximate result of Dmytruk's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

311.   The balance of equities tips in Ravago's favor because Dmytruk agreed not to use the Ravago Trade Secrets and Dmytruk has no legitmate reason to use the Ravago Trade Secrets.

312.   An injunction preventing Dmytruk from using the Ravago Trade Secrets is in the public interest.

313.   Ravago is entitled to a preliminary injunction preventing Dmytruk from using or threatening further disclosure of Ravago Trade Secrets.

314.   Ravago is entitled to a permanent injunction preventing Dmytruk from using Ravago Trade Secrets.

## COUNT IX
## VIOLATION OF FLORIDA TRADE SECRETS ACT

315.   Ravago incorporates Paragraphs 1 – 314 above as if fully restated herein.

316.   This is an action for injunctive relief and damages under the Florida Trade Secrets Act, Chapter 688, Florida Statutes ("FTSA").

317.   Ravago owns and possesses the Ravago Trade Secrets.

318.   Ravago's headquarters are in Florida.

319.   Immediately prior to his resignation from Ravago, Dmytruk was a resident and citizen of Florida.

320.   Ravago's business operates in interstate commerce, directed from its headquarters in Florida.

321.   After resigning from Ravago, Dmytruk remains subject to a duty not to use trade secrets that he acquired in the course of his employment, for his own benefit or that of a competitor to the detriment of Ravago.

322.   The Ravago Trade Secrets are not public and are made available only to select employees who require the information for performance of their duties.

323.   The Ravago Trade Secrets are trade secrets under the Florida Trade Secrets Act because they are comprised of business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, as described in Fla. St. § 688.002(4).

324.   As set forth herein, Ravago takes reasonable efforts under the circumstances to keep the Ravago Trade Secrets secret.

325.   The Ravago Trade Secrets derive independent economic value by not being known or readily ascertainable by proper means by other persons who can obtain economic value from their disclosure or use.

326.   Dmytruk acquired the Ravago Trade Secrets under a duty to maintain their secrecy.

327.   Ravago did not give permission to Dmytruk to take the Ravago Trade Secrets when he left.

328.   Dmytruk took the Ravago Trade Secrets for his personal benefit to achieve a new position with VPA and for a larger salary at VPA.

329.   Dmytruk willfully and maliciously misappropriated the Ravago Trade Secrets and continues to have them to this day.

330.   As a result of Dmytruk's misappropriation of the Ravago Trade Secrets, Ravago is suffering injury and harm due to its reputation and good will among its customers and suppliers. Ravago may lose customers and suppliers to competitors that it cannot recover. Without immediate and permanent injunctive relief, Ravago will sustain irreparable injury for which there is no adequate remedy at law.

331.   As a result of Dmytruk's misappropriation of the Ravago Trade Secrets, Ravago has suffered damages for his prior actions, which, if not enjoined, will be difficult if not impossible to measure, including loss of profits that would have been earned but for his actions. Ravago is thus entitled to preliminary and permanent injunctive relief to stop any further harm to its business, which cannot reasonably be measured, as well as to recover any monetary damages for actions taken prior to injunctive relief being granted.

332.   Dmytruk's conduct has been willful, entitling Ravago to exemplary damages under the Florida Trade Secrets Act.

## COUNT X
## THREATENED MISAPPROPRIATION UNDER THE FTSA

333.   Ravago incorporates Paragraphs 1 – 332 above as if fully restated herein.

334.  Under the FTSA, "[a]ctual or threatened misappropriation may be enjoined. § 688.003(1), Fla. St.

335.  Unless enjoined, Dmytruk threatens to continue to use or disclose the Ravago Trade Secrets in his capacity as President of VPA.

336.  As a proximate result of Dmytruk's conduct, Ravago is likely to suffer irreparable harm in the absence of preliminary relief because of the threatened loss of its exclusive use of the Ravago Trade Secrets.

337.  The balance of equities tips in Ravago's favor because Dmytruk agreed not to use the Ravago Trade Secrets and Dmytruk has no reason to use Ravago Trade Secrets.

338.  An injunction preventing Dmytruk from using Ravago Trade Secrets is in the public interest.

339.  Ravago is entitled to a preliminary injunction preventing Dmytruk from using Ravago Trade Secrets.

340.  Ravago is entitled to a permanent injunction preventing Dmytruk from using Ravago Trade Secrets.

## COUNT XI
## COMPUTER FRAUD AND ABUSE ACT

341.  Ravago incorporates Paragraphs 1 – 340 above as if fully restated herein.

342.  This is an action for damages and injunctive relief under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

343.  Ravago provides each of its employees access to a computer and computer network for purposes of fulfilling the employee's duties to Ravago.

344.  Ravago's Employee Handbook directs that all computers issued to Ravago employees must be returned upon their departure from the company.

345.   The Employee Handbook further requires that the computer be returned in the condition in which it was maintained by the employee during his or her employment.

346.   No former employee is authorized to access or alter any Ravago computer or any information contained on a Ravago computer after departing the company's employment.

347.   Dmytruk intentionally accessed his Ravago-issued computer with <u>the intent to delete Ravago information from it</u>.

348.   Ravago did not authorize Dmytruk to erase and restore his Ravago computer.

349.   By downloading the information from his Ravago computer to his LaCie hard drive which he never returned to Ravago, Dmytruk obtained a substantial amount of information from Ravago.

350.   Ravago has been damaged in excess of $5,000.00 as a result of Dmytruk's unauthorized access to its computer, and has incurred attorneys' fees in bringing this claim.

## PRAYER FOR RELIEF

Based on the foregoing, Ravago prays for the following relief:

1.   Specific Performance by Dmytruk of all obligations under the Agreement.

2.   Preliminary injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from using Ravago Confidential Information, including its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, so long as that information remains Confidential under the Agreement.

3.     Permanent injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from using Ravago Confidential Information, including its product information, financial information, supply and service information, marketing information, personnel information, customer information, and business information, so long as that information remains Confidential under the Agreement.

4.     Preliminary injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from using Ravago Trade Secrets, including the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Ravago's products and services.

5.     Preliminary injunctive relief to prevent Dmytruk's threatened misappropriation under the DTSA, including restricting Dmytruk's activities with VPA and its related entities to prevent disclosures of the information.

6.     Permanent injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from using Ravago Trade Secrets, including the design, specifications, capacity, testing, installation, implementation and customizing techniques and procedures concerning Ravago's products and services.

7.     Preliminary injunctive relief to prevent Dmytruk's threatened misappropriation under the FTSA, including restricting Dmytruk's activities with VPA and its related entities to prevent disclosures of the information.

8.     Preliminary and permanent injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from soliciting Ravago employees for eighteen months from the date of the injunction or such other period as the Court determines to be acceptable.

9.     Preliminary and permanent injunctive relief preventing Dmytruk, his agents, employees, attorneys, and other persons who are in active concert or participation with Dmytruk, from soliciting Ravago customers for eighteen months from the date of the injunction or such other period as the Court determines to be acceptable, including enforcement of the tolling provision in the Agreement.

10.    Judgment in favor of Ravago against Dmytruk, awarding all available relief, including compensatory and exemplary damages in an amount to be determined at trial, under the DTSA, as may be appropriate.

11.    Judgment in favor of Ravago against Dmytruk, awarding all available relief, including compensatory and exemplary damages and attorney's fees in an amount to be determined at trial, under the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes, as may be appropriate.

12.    Judgment in favor of Ravago against Dmytruk for breach of contract for violating Sections 3, 4, 6, 7, and 8, jointly and severally, of the Agreement, including costs and attorney's fees, in an amount to be determined at trial.

13.    Judgment in favor of Ravago against Dmytruk, awarding all available relief, including compensatory and exemplary damages and attorney's fees in an amount to be determined at trial, under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

14.    For trial by jury for all claims so triable.

15.     For all other relief as the Court may find just and proper.

Respectfully submitted,

*/s/ James T. Shearin*
**James T. Shearin (ct01326)**
Pullman & Comley LLC
850 Main Street
P.O. Box 7006
Bridgeport, CT 06601-7006
Telephone: 203-330-2240
Facsimile: 203-576-8888
E-mail: jtshearin@pullcom.com

**OLIVER BENTON CURTIS III**
*to be admitted pro hac vice*
ben.curtis@nelsonmullins.com
NELSON MULLINS BROAD AND CASSEL
2 South Biscayne Blvd., # 2100
Miami, Florida 33131
Telephone No. 305-373-9464

**ERIKA BIRG**
*To be admitted pro hac vice*
erika.birg@nelsonmullins.com
NELSON MULLINS RILEY &
SCARBOROUGH LLP
201 17th St. NW, Suite 1700
Atlanta, Georgia 30363
Telephone No. 404-322-6110

~#4829-7048-0258 - 152998/01500~